IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-cv-02343-RBJ

BETTY J. CORTEZ,

 Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

 Defendant.

---

## ORDER

---

 This matter is before the Court on an application for Social Security Disability Benefits by plaintiff, Betty J. Cortez, under Title II of the Social Security Act. It became ripe for review upon filing of the plaintiff's reply brief on March 03, 2011. The Court apologizes to the parties for the delay in resolving this case.

 **Facts**

 Claimant Betty J. Cortez was born on June 4, 1961. R. at 20. She has at least a high school education and is able to communicate in English. *Ibid*. Ms. Cortez applied for disability benefits on June 18, 2007, alleging disability with an onset date of December 31, 2005. R. at 9. Her claim was initially denied in October 2007, and she timely filed a written request for hearing. *Ibid*. A hearing was held before Administrative Law Judge Randi E. Lappin (the "ALJ") on May 28, 2009, and Ms. Cortez' claim was again denied on July 10, 2009. R. at 8-9. Ms. Cortez appealed this decision to the Appeals Council, in part based on new evidence submitted with her request for review. R. at 27-32; *see* R. at 411-439 (Exhibits 16F and 17F).

1

The Appeals Council denied her claim for benefits on July 23, 2010 but included the new evidence in the administrative record. R. at 1-5, 411-439.

Ms. Cortez' application for disability benefits alleges fibromyalgia, depression, arthritis, insomnia and fatigue. R. at 117. The administrative record details her medical treatment, which the Court has reviewed in full but finds far too extensive to summarize in detail. In brief, in the approximately five and a half years between February 2005 and September 2009 Ms. Cortez had more than 70 doctor's visits with more than five medical centers or individual clinicians. *See* R. at 172-439 (exhibits 3F-17F). She was also seen in several area emergency rooms ("E.R.'s"), at least 14 times over the same time period, sometimes within a day or a few days of an earlier emergency room or doctor's visit. *Ibid; see, e.g.*, R. at 309-19, 201-05 (records of visits to two different emergency rooms on May 04, 2007 and May 05, 2007).

Ms. Cortez sought and received treatment for a variety of well-documented medical problems, including: fibromyalgia, positive for 18 of 18 points in a tender point exam in records provided with the new evidence to the Appeals Council but earlier diagnosed; rheumatoid arthritis diagnosed based on synovitis or inflammation, again confirmed with the new evidence but previously diagnosed; leg pain; occasional wrist, knee and bilateral ankle and foot swelling; a tearing ligament in her right wrist; tendon repair of her right ankle; knee pain; herniated nucleus pulposus and back pain; and anxiety and well controlled major depression. *Ibid*. On multiple occasions Ms. Cortez' doctors advised that she visit a psychologist, but the records do not evidence any psychiatric care. They document only a psychiatric consultative examination from Brett Valette, Ph.D. R. at 17, 419, 293-295.

Ms. Cortez' primary form of treatment for her ailments appears to be prescription medication, though there are some indications of other treatments in the record. In

approximately 2004 she received some steroid injections for her spinal issues.  R. at 242.  In May

2007 Ms. Cortez reported that she had unsuccessfully tried treatments such as physical therapy,

whirlpool and TENS, but there is no documentation for such treatment in the administrative

record.  R. at 255.  In October 2008 she had surgery to repair a torn tendon in her right ankle.  R.

at 415.  She self-reported some related physical therapy, though again the administrative record

lacks direct treatment records.  R. at 373.

Although her full prescription record is not available, a prescription history for the year

February 2008 to February 2009 reveals that the Ms. Cortez received 26 prescriptions for

hydrocodone and 17 prescriptions for oxycodone/oxycontin.  R. at 407-410.  These prescriptions

were for varying days' supply but totaled over 1,250 pills (an average of just over three per day)

and were issued by more than 15 different doctors, albeit a number within the same orthopedic

practice group.  *Ibid.*  The Court makes these observations without the medical expertise to

evaluate the severity of Ms. Cortez' pain or the reasonableness of her consumption of pain

medication.  However, several of claimant's medical providers have expressed concerns

regarding drug-seeking behavior and a desire to wean her from opioid medications, as well as

observed losses of medications, dating to before her alleged disability onset date.  R. at 322

(November 15, 2005 visit reporting that some of her pain medication had been stolen and

requesting a refill); R. at 320 (January 2006 note from Judy Weiss, M.D., "Betty called today

requesting more pain medication. . .  I am concerned that she may have a problem with pain

medications" ); R. at 179-89 (E.R. records from mid- to late-2006 documenting concerns of

"probably drug-seeking behavior", a pain management contract, and instructions from a primary

care physician not to provide prescriptions for medication that he had provided just a few days

prior); R. at 190 (Scott T. Boyd, M.D., expressing concern in September 2006 that claimant was

3

"getting another early refill" of her pain medications); R. at 355-370 (noting that Dr. Boyd ended the treatment relationship and limited her Oxytocin); R. at 277 (January 30, 2007 emergency visit to Daniel Brookoff, M.D./Ph.D., for allegedly stolen pain medication); R. at 355 (March 28, 2008 note from Adam Palazzari, M.D., that he was discontinuing treatment because claimant continued to seek opioid medication despite "the fact that she hasn't been able to use these medications safely due to repeat accelerations in her consumption"); R. at 346-48 (February 2009 E.R. records documenting a telephone conservation with Ms. Cortez' regular physician, who reportedly "told the patient that she did not fill [sic] narcotics were appropriate for her pain and had hoped not to have her on any"); R. at 333 (April 22, 2009 treatment notes from Dr. Palazzari observing "some drug-seeking behavior" and discussing the need to wean her off Vicodin and to have her sign a narcotic contract).

The ALJ followed the five-step evaluation process provided at 20 C.F.R. § 404.1520(a)(4) to determine if Ms. Cortez was disabled. *See* 20 C.F.R. § 404.1520(a)(4). At step one the ALJ found that claimant had not engaged in substantial gainful activity since December 31, 2005, when she applied for benefits. R. at 11. At step two, he determined that:

> The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine; fibromyalgia; mild degenerative joint disease of the knees; history of right ankle tendonitis/tear, status-post tenosynovectomy; and history of migraines.

*Ibid*. At step three, he found that these impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 13.

Step four requires an ALJ to assess a claimant's residual functional capacity ("RFC") in light of medical impairments and determine if the claimant is capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ made the following RFC assessment:

[T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can lift and carry up to 5 pounds frequently and 10 pounds occasionally; sit for up to 6 hours out of an 8-hour day; and stand and/or walk for up to 2 hours out of an 8-hour day. The claimant can frequently balance and occasionally stoop, crouch, kneel, crawl, and climb ramps/stairs, but should never climb ladders, ropes, or scaffolds, nor work at unprotected heights or around dangerous moving machinery. She can use her hands frequently, but not constantly, to operate hand controls, handle objects and perform fingering. Similarly, the claimant is able to operate foot controls frequently, but not constantly. The claimant is limited to understanding, remembering, and carrying out no more than simple, routine instructions. She also requires the opportunity to elevate her legs while in a seated position at a height of 12 to 18 inches.

R. at 14. Given this RFC, the ALJ determined that Ms. Cortez is unable to perform any of her past relevant work as a hand packager, baker, cashier/checker and cook. R at 20.

Next, the ALJ applied the Medical-Vocational Guidelines and employed the expertise of a vocational expert ("VE"), James Hardaway, to determine whether jobs existed in the national economy for an individual with the claimant's age, education, work experience and residual functional capacity. R. at 21. Based on the VE's testimony, the ALJ found that several potential positions did exist. *Ibid*. Representative occupations listed by the VE were addresser, document preparer, and cutter paster; the ALJ found that these positions existed in significant numbers in the national economy. *Ibid*. Thus, the ALJ determined that Ms. Cortez is not disabled within the meaning of the Social Security Act. R.at 22.

### Standard of Review

This appeal is based upon the administrative record and the parties' briefs. The Court's role is to determine if the record "contains substantial evidence to support the Secretary's decision and whether the Secretary applied the correct legal standards." *Rickets v. Apfel*, 16 F. Supp. 2d 1280, 1287 (D. Colo. 1998). A decision is not based on substantial evidence when "overwhelmed by other evidence in the record. . . ." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th

Cir. 1988).  Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2007).  It is not "mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

The Appeals Council's denial of review means that the ALJ's decision becomes the final decision of the Commissioner.  *Wilkins v. Sec'y, Dep't of Health and Human Serv.*, 853 F.2d 93, 96 (10th Cir. 1991).  This Court reviews the record as a whole, including the new evidence, to determine whether substantial evidence supports the Secretary's findings.  *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994); *see also Corber v. Massanari*, 20 F. App'x 816, 818 (10th Cir. 2001) (unpublished) (affirming propriety of District Court's evaluation of new evidence).

### Conclusions

Claimant makes two primary challenges to the ALJ's determination.  First, she argues that the Commissioner's determinations regarding the severity of her pain and her ability to function were not supported by substantial evidence.  Next, she argues that the ALJ inappropriately assessed her RFC.  The discussion that follows addresses each of these claims.

Assessment of Claimant's Pain and Functioning

Ms. Cortez contends that the Commissioner improperly evaluated the impact of her pain and how it affects her functioning so that his decision that she is not disabled is not supported by substantial evidence.  To qualify a claimant as disabled, her pain must be so severe "by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990) (citing *Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986)).  To make this determination, the Commissioner must look to the medical record and the claimant's credibility.  *Id.*

Ms. Cortez argues that the ALJ did not adequately discuss whether there was a nexus between her pain and other symptoms and her medical impairments.  She claims that the ALJ did not, but should have, started with the understanding that her conditions could cause some pain. She asserts that, had he done so, he would have found Ms. Cortez unable to work based on her need to spend most of the day lying down or resting in a reclined position.  She also claims that her fibromyalgia was more severe than the ALJ found.  She further asserts that the ALJ selectively ignored portions of the administrative record and medical evidence that would support a finding of disability.  Specifically, she argues that the ALJ ignored Dr. Brookoff's consistent observation that the claimant "[m]aintains household and family activities though frequently has to lie down."  R. at 253, 264, 268, 271, 275, 278, 282, 288, 357, 362, 367.  She also argues that the ALJ ignored her diagnosis of rheumatoid arthritis and the severity of her hand impairment, as well as the clinical significance of swelling in her hands.

As a general matter, while the ALJ must consider all of the evidence, an ALJ "is not required to discuss every piece of evidence."  *Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996).  Although the evidence may support two inconsistent conclusions, that "does not prevent an administrative agency's finding from being supported by substantial evidence." *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004).  The Court cannot "reweigh the evidence or substitute [its] judgment for that of the agency."  *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  In the Tenth Circuit "we generally treat credibility determinations made by an ALJ as binding upon review."  *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

In this case, it is clear that the ALJ closely examined the administrative record and the medical evidence.  His decision is replete with nuanced discussion of the notes from Ms. Cortez' medical treatment by a number of different providers.  *See* R. at 16-20.  The ALJ did address Ms.

Cortez' allegations that she frequently needed to lie down, rebutting her allegations of debilitating pain by finding them inconsistent with her clinical presentations, some of her own statements, and her record of some work during her alleged period of disability.  R. at 16-17.  He also observed the claimant's history of prescription narcotic abuse, and that her medical records indicated that she had provided misinformation to her doctors in the past.  R. at 17.  For these varied reasons, he found her to lack credibility and concluded that her "allegations of debilitating pain and symptoms are simply not persuasive and are inconsistent with the objective medical findings of record."  *Ibid*.

Given this detailed explanation for the ALJ's credibility findings and his conclusion that Ms. Cortez' pain was not as severe as alleged this Court finds the ALJ's conclusions to be "closely and affirmatively linked to substantial evidence."  *See Williams v. Barnhart,* 178 Fed. App'x 785, 789 (10th Cir. 2006) (unpublished) (affirming District Court's decision to uphold an ALJ's credibility determination after a similarly specific explanation of findings).  While the ALJ did not examine the evidence presented to the Appeals Council, the Court observes that this evidence is largely duplicative of evidence already in the administrative record, as Ms. Cortez had previously been diagnosed with rheumatoid arthritis and fibromyalgia as well as with occasional swelling in her extremities.  *See, e.g.,* R. at 222-47, 330-39.  Moreover, the Appeals Council considered "the additional evidence" and "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  R. at 1-2.  Under this Circuit's precedent, the general practice "is to take a lower tribunal at its word when it declares that it has considered a matter."  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *see also Robinson v. Astrue,* 397 F.App'x 430, 432 (10th Cir. 2010) (unpublished).  This practice applies in Social Security cases.  *Id*.  Here, claimant offers the Court no reason to depart from the

8

general precedent.  She has not persuasively argued, and the Court does not find, that the new

clinical evidence is so compelling as to undermine the substantial evidence supporting the ALJ's

conclusion that she is not disabled.

Vocational Determination

The claimant also argues that the ALJ's vocational findings were not supported by

substantial evidence.  First, she claims that the RFC limitation to "understanding, remembering,

and carrying out no more than simple, routine instructions" would prevent her from performing

any of the jobs suggested by the Vocational Examiner.  The Court first observes that the record

does not strongly demonstrate that claimant is unable to carry out more than simple or routine

instructions.  Rather, the record indicates that Ms. Cortez has a Global Assessment of

Functioning of 70-75, which supports "no more than slight impairment in social, occupational, or

school functioning" or "some mild symptoms OR some difficulty in social, occupational, or

school functioning… but generally functioning pretty well. . . ."  R. at 12; American Psychiatric

Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., text

revision 2000).  As observed by the ALJ, she was found to have "an appropriate affect with clear

thought processes" during her consultative psychological examination.  R. at 12.  She was

oriented times and had good memory, could perform serial 3's, and spelled "world" backward

correctly.  *Ibid*.  A state psychologist also found her mental impairment non-severe.  *Ibid*.

The record evidence arguably does not support the RFC finding that Ms. Cortez is limited

to "understanding, remembering, and carrying out no more than simple, routine instructions."  If

anything, it cuts against Ms. Cortez' claim of disability.  However, the Court finds that including

this limitation in Ms. Cortez' RFC was harmless error on the part of the ALJ, since the ALJ

explained his reasons for including this limitation during her hearing, and because she was still

found to be employable.[1]  R. at 51-54.  The VE considered this limitation in determining, based on his extensive qualifications and experience as set forth in Exhibit 7-B, that a claimant with Ms. Cortez' RFC could perform the duties of addresser, document preparer, and cutter paster.  R. at 53.  The Court declines to second-guess the expertise of the VE and the ALJ by undercutting their findings in this regard given the lack of clear medical evidence of a mental limitation.

Next, claimant argues that the RFC failed to adequately account for limitations on Ms. Cortez' fingering established by Dr. Palazzari in the new evidence, and for her need to rest during the day.  As set forth above, the ALJ's determinations as to Ms. Cortez' credibility and the extent of her impairments was supported by substantial evidence.  The new evidence is largely duplicative of evidence the ALJ explicitly considered and applied in finding that Ms. Cortez was not disabled.  Even if the ALJ could have gone the other way, by finding that Ms. Cortez's fingering capabilities were limited and that she regularly needed to rest during the day, he appears to have read, understood and applied the law to the facts in the record.  His determination that Ms. Cortez's allegations regarding the scope of her impairments was not credible is entitled to deference and was supported by substantial evidence.  Therefore, because of the limited nature of our review, the Commissioner's decision is affirmed.

DATED this 26th day of March, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

---

[1] He found that this limitation might arise due to "distraction of pain, fatigue, and effects of medication."  R. at 52.